UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LEEBER REALTY LLC and BERNARD
COHEN, *both individually and in his
capacity as Trustee of the Bernard Cohen
Revocable Trust*,

                                    Plaintiffs,

        v.

TRUSTCO BANK,

                                    Defendant.

No. 17-CV-2934 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Michael A. Freeman, Esq.
Greenberg Freeman, LLP
New York, NY
*Counsel for Plaintiffs*

Adam K. Kurland, Esq.
Fenster & Kurland LLP
New City, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        Plaintiffs Leeber Realty LLC ("Leeber") and Bernard Cohen ("Cohen" and collectively,

"Plaintiffs") brought this Action against Trustco Bank ("Defendant"), alleging that Defendant

breached a commercial lease contract. (Am. Compl. (Dkt. No. 39).) Defendant counterclaimed

that Plaintiffs breached the contract by failing to make necessary repairs and that Defendant was

constructively evicted. (Am. Answer to Am. Compl. With Counterclaims ("Am. Answer") 4–7

(Dkt. No. 42).) Before the Court is Plaintiffs' Motion for Summary Judgment, fees and costs,

and dismissal of the counterclaims.  (Notice of Mot. (Dkt. No. 53).)  For the following reasons, the Motion is granted in part and denied in part.

## I.  Background

### A.  The Parties' 56.1 Statements and Evidentiary Objections

Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ. R. 56.1(b).  "If the opposing party . . . fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule."  *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (internal quotation marks omitted)); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (same).  "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).

Here, Plaintiffs filed and served their statement pursuant to Rule 56.1, (Pls.' Rule 56.1 Statement ("Pls.' 56.1") (Dkt. No. 54)), and Defendant filed a response, (Def.'s Rule 56.1 Statement ("Def.'s 56.1") (Dkt. No. 59)).  However, Defendant's response for the most part does not comply with Rule 56.1.  Of the 85 separately numbered paragraphs in Plaintiffs' 56.1 statement, (Pls.' 56.1), Defendant conceded that 62 of them are "[u]ncontested," (Def.'s 56.1).  Of the remaining 23 paragraphs, Defendant (1) failed to answer one of them, (Def.'s 56.1 ¶ 48);

(2) stated that it lacked sufficient information to respond to three of them, (*id.* ¶¶ 81, 82, 83); (3) asserted an "objection" on legal grounds to nine of them, (*id.* ¶¶ 43, 50, 51, 61, 71, 75, 80, 84, 85); and (4) "contested" 10 of them, (*id.* ¶¶ 3, 25, 32, 35, 38, 41, 55, 64, 73, 74).

"[T]he Court has afforded no weight to any legal argument" in Plaintiff's 56.1 Statement. *Greene v. City of New York*, No. 08-CV-243, 2017 WL 1030707, at *1 n.3 (E.D.N.Y. Mar. 15, 2017). However, the purported legal objections Defendant raises are without merit, (Def.'s 56.1 ¶¶ 43, 50, 51 (arguing that "[t]he recitation of deposition testimony of a witness . . . is not an appropriate statement of material fact"); *id.* at ¶¶ 61, 71, 75, 80, 84, 85 (objecting to the alleged use of the word "quit" and mathematical calculations under the lease terms as "legal conclusion[s]"); *see also id.* ¶ 3 ("'Regularly' is vague and ambiguous."); *id.* ¶¶ 73–74 (objecting to use of the word "default" because it "is a legal conclusion")), and, in any event, do not actually respond to or dispute the specific facts, supported by citations to admissible record evidence, alleged in the relevant paragraphs. *See Baity*, 51 F. Supp. 3d at 418 ("[A] number of [Defendant's] purported denials quibble with [Plaintiffs'] phraseology, but do not address the factual substance asserted by [Plaintiffs]."). Similarly, Defendant has failed to actually dispute the purported material facts in the paragraphs it has "contested" in Plaintiffs' 56.1 statement. Instead, in all but two of the remaining "contested" paragraphs, Defendant contends that the evidence Plaintiffs cite does not support the asserted factual statements. (Def.'s 56.1 ¶¶ 25, 32, 35, 38, 41, 55.) The Court has independently reviewed the cited portions of the record to make sure they support Plaintiffs' factual assertions. *See Baity*, 51 F. Supp. 3d at 421 ("[T]he Court is mindful that . . . a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." (alteration and internal quotation marks omitted)). But, provided they are supported by the record, Defendant's failure to actually dispute the factual

material in these identified paragraphs, let alone provide record citations in attempting to dispute

them, permits the Court to find them undisputed. *See Holtz*, 258 F.3d at 73 (explaining that a

court is not required to search the record for genuine issues of material fact that the party

opposing summary judgment failed to bring to the court's attention); *Baity*, 51 F. Supp. 3d at 418

(collecting cases holding that "responses that do not point to any evidence in the record that may

create a genuine issue of material fact do not function as denials, and will be deemed admissions

of the stated fact." (alteration and internal quotation marks omitted)); *id.* at 419 ("[S]everal of

[the] [p]laintiff's purported denials lack citations to admissible evidence or any evidence to

support his contention, in violation of Fed. R. Civ. P. 56(c) and Local Rule 56.1.").

 Defendant does cite the record—specifically, an affirmation from Defendant's counsel,

Adam K. Kurland—in two of the "contested" paragraphs. (Def.'s 56.1 ¶¶ 3, 64 (citing Def.'s

Mem. of Law in Opp'n to Mot. for Summ. J. ("Def.'s Mem.") Ex. 1 ("Kurland Aff.") (Dkt. No.

58)).) This affirmation describes the contents of a telephone conversation he had with

Christopher Wirth, a potential witness identified during discovery, *see* Fed. R. Civ. P. 26, who

was never deposed, has not submitted an affidavit or declaration and indeed has not responded to

Kurland's attempts to contact him regarding a proposed affidavit Kurland drafted on Wirth's

behalf, (Kurland Aff. ¶¶ 5–7). Therefore, this affirmation contains inadmissible hearsay

statements, and the Court will not consider it in deciding the instant Motion. *See Union Ins. Soc.

of Canton, Ltd. v. William Gluckin & Co.*, 353 F.2d 946, 952 (2d Cir. 1965) (holding that an

attorney affirmation not based on personal knowledge is hearsay and is not to be considered on

motion for summary judgment); *Cavanagh v. Ford Motor Co.*, No. 13-CV-4584, 2017 WL

2805057, at *8 (E.D.N.Y. June 9, 2017) ("Plaintiffs seem to rely on conversations that their

counsel had with former employees . . . Such inadmissible hearsay, whether in a witness

affidavit or an attorney affirmation however, cannot form the basis of a party's opposition to summary judgment."), *adopted*, 2017 WL 2804934 (E.D.N.Y. June 28, 2017); *Baity*, 51 F. Supp. 3d at 419 (declining to consider "the improper assertions and arguments contained in [an attorney] affirmation, or the exhibits to the affirmation containing inadmissible evidence" (internal quotation marks omitted)); *see also* Fed. R. Evid. 801(c) (defining hearsay); Fed. R. Evid. 802 (denoting hearsay as inadmissible evidence); Fed. R. Civ. P. 56(c)(4) (providing that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated").

Furthermore, despite failing to identify additional material and disputed facts in its 56.1 statement, Defendant cites additional evidence in its memorandum opposing the Motion for Summary Judgment. (*See* Def.'s Mem.) This evidence includes, among other things, sworn affidavits from Robert Leonard ("Leonard"), Defendant's Executive Vice President and Chief Risk Officer, and Joseph Marley ("Marley"), Defendant's Officer of Purchasing, Mail Services and Security. (Def.'s Mem. 2–4, 9 (citing *id.* Ex. 2 ("Leonard Aff."); *id.* Ex. 3 ("Marley Aff.")).) Both of these affidavits include inadmissible evidence. Leonard's affidavit parrots Defendant's counterclaims verbatim, as does Defendant's memorandum. (*Compare* Leonard Aff. ¶¶ 3–10 *with* Am. Answer 4 ¶¶ 1–8 *and* Def.'s Mem. 2–4.) Additionally, Leonard asserts, without identifying the basis of his knowledge, that "[a]s a result of the conditions at the Premises, Defendant was deprived of its ability to conduct banking operations at the Premises in a continuous manner." (Leonard Aff. ¶ 11.) Such a conclusory assertion is inadmissible in opposition to a summary judgment motion. *See Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 131 n. 12 (2d Cir. 2004) (noting that district court was free to disregard hearsay statements

and speculation in affidavits); *Wyler v. United States*, 725 F.2d 156, 160 (2d Cir. 1983) ("An affidavit . . . which does not contain specific facts or is not based on first-hand knowledge is not entitled to any weight."); *Baity*, 51 F. Supp. 3d at 419 ("[The] [a]ffidavit also contains a surfeit of improper averments, including statements not based on [the affiant's] personal knowledge and conclusory statements that are nothing more than speculation.").  Similarly, Leonard avers that "it became clear that it would not be possible to remediate the mold infestation of the Premises without an extended closure of the branch," but does not explain the factual basis or his personal knowledge of this claim.  (Leonard Aff. ¶ 12.)  Moreover, to the extent Defendant is offering Leonard's opinion regarding mold remediation, it is inadmissible lay opinion testimony, because he has not been identified as an expert in this area.  *See* Fed. R. Evid. 701 (limiting lay opinion testimony); Fed. R. Evid. 702 (listing requirements for expert testimony); *Nimely v. City of New York*, 414 F.3d 381, 395–397 (2d Cir. 2005) (describing standards governing the admissibility of expert testimony).

Marley's Affidavit suffers from similar defects, including conclusory statements lacking any basis in fact or personal knowledge.  (Marley Aff. ¶ 4 ("Hazardous environmental conditions have existed at the Premises since in or about 2009 . . ."); *id.* ¶ 5 ("Plaintiffs knew about the need for repairs due to the hazardous conditions, but repeatedly failed to remedy them.").)  Other statements suffer from different defects.  For example, Marley avers that he "personally notified . . . Cohen numerous times of the need for repairs."  (*Id.* ¶ 6.)  However, this statement contradicts his earlier deposition testimony and will not be considered.  (*See* Pls.' 56.1 Ex. 13 ("Marley Dep.") 31–33 (testifying that he spoke to Cohen on the telephone "[o]nce," on December 14 or 18, 2016, about the toilet clogging, and tried to call him, but had to leave a voicemail, three times).  *See In re Fosamax Prod. Liab. Litig*., 707 F.3d 189, 193 (2d Cir. 2013)

(per curiam) (explaining that "the 'sham issue of fact' doctrine . . . prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony"); *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony.").

Therefore, for the reasons discussed above, in analyzing the instant Motion, the Court has disregarded: (1) purported "objections" or "contest[ations]" in Defendant's 56.1 Statement that do not actually deny or refute the specific facts asserted by Plaintiffs, are not supported by citations to admissible evidence in the record, or are improper legal arguments; (2) improper assertions and arguments contained in Defendant's counsel's affirmation that are clearly not based on personal knowledge or admissible evidence; and (3) the improper portions of Leonard's and Marley's Affidavits.

## B.  Factual Background

The following facts are taken from Plaintiff's 56.1 Statement, Defendant's response to that statement, and the admissible evidence submitted by both Parties, and are recounted "in the light most favorable to" Defendant, the non-movant.  *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018) (internal quotation marks omitted).  The facts as described below are not in dispute, except to the extent indicated.

### 1.  The Property and the Lease

Plaintiffs own commercial property located at 21 Route 59, Nyack, New York (the "Property").  (Pls.' 56.1 ¶¶ 2, 7.)  Plaintiff Cohen lives in Florida and does not regularly visit the

Property.  (*Id.* ¶ 3.)[1]  The Property contains a building with two leasable units of approximately

equal size.  (*Id.* ¶ 8.)  The building is served by a single sewer line (or, "lateral") that connects

both units to the sewer system owned by the local municipality.  (*Id.* ¶ 9.)  The sewer lateral does

not serve any other building or property other than the Property.  (*Id.* ¶ 10.)

Defendant, a federal savings bank based in Glenville, New York, rented one of the units

at the Property (the "Premises").  (*Id.* ¶¶ 13–14.)  Specifically, Plaintiff Leeber and Defendant

entered into a 20-year written lease, commencing November 1, 2004, (*id.* ¶ 19), pursuant to

which Defendant would lease the Premises for the purpose of operating a retail banking branch,

(*id.* ¶ 14 (citing *id.* Ex. 3 ("Lease") §§ 1.01, 5.01).)  In 2008, Leeber and Defendant agreed to

extend the Lease term by an additional five years.  (Pls.' 56.1 ¶ 16.)  The Lease specifies that

Defendant shall continuously operate and keep open its retail bank branch at the Premises during

the entire Lease term.  (*Id.* ¶ 17.)  It also requires Defendant to pay "Minimum Annual Rent" and

"Additional Rent" to the landlord, Cohen, in installments throughout the lease term.  (*Id.* ¶ 18.)

The Lease states that Defendant's "obligation to pay any and all Rent under this Lease . . . shall

survive any expiration or termination of this Lease."  (*Id.* ¶ 20.)  The Lease further provides:

> Landlord shall not be required to make any repairs or improvements of any kind
> upon the Demised Premises except for necessary exterior or structural repairs,
> provided that if such necessary exterior or structural repairs are required due to
> Tenant's acts or omissions, or those of Tenant's agents, employees, or contractors,
> then Tenant shall be responsible for the costs of such repairs or improvements.
> From and after the Possession Date, Tenant shall, at its own cost and expense, take
> good care of and make necessary non-structural repairs to the interior of the
> Demised Premises, and the fixtures and equipment therein and appurtenances
> hereto, including, but not limited to, the . . . . floor coverings; interior walls[;] . . .
> plumbing, [and] sewage facilities . . . .  Tenant hereby waives any rights it may have
> to make repairs or perform maintenance as provided in any law, ordinance or
> regulation which may now exist or hereafter be enacted or enforced, which confers

---

[1] Cohen was the sole member of Plaintiff Leeber, an LLC, but transferred his
membership interest to the Bernard Cohen Revocable Trust in 2014, of which he is the sole
trustee.  (Pls.' 56.1 ¶¶ 4–6.)

upon Tenant the right to make any repairs to the Demised Premises for the account of Landlord.

(Lease § 7.01.)

Furthermore, the Lease provides that "Tenant shall immediately notify Landlord in writing of any environmental concerns of which Tenant is, or becomes, aware or which are raised by any private party or government agency with regard to Tenant's business or the Demised Premises." (*Id.* § 5.07(b)).) Similarly, the Lease requires Defendant to "give prompt notice to Landlord in case of . . . accidents in the Demised Premises, or in the Building, or of any defects therein or in any fixtures or equipment." (*Id.* § 14.06.) This notice "must be served by certified mail, return receipt requested, postage prepaid, or by Federal Express or other nationally recognized overnight delivery service, addressed to Landlord at the address set forth in [§] 1.01, or to such other address as Landlord may designate by written notice." (*Id.* § 13.01(a).)

In the section titled "Destruction," the Lease states:

> If the Demised Premises shall be partially damaged by any casualty covered under Landlord's insurance policy, Landlord shall, upon receipt of the insurance proceeds, repair the same . . . and the Minimum Annual Rent shall be abated proportionately as to that portion of the Demised Premises rendered untenantable. . . . If (a) the Demised Premises (i) by reason of such occurrence is rendered wholly untenantable, or (ii) should be damaged as a result of a risk which is not covered by Landlord's insurance, or (b)) the Building . . . should be damaged to the extent of fifty percent (50%) or more of the then monetary value thereof, then, in any of such events described in (a) or (b) above, Landlord may either elect to repair the damage . . . . (other than damage to Tenant's fixtures . . . equipment . . . and any other portions of the Demised Premises or any property located therein . . . as to which Tenant shall be responsible to repair or restore as provided below) or may cancel this Lease by notice of cancellation given within one hundred eighty (180) days after such event and thereupon this Lease shall expire, and Tenant shall vacate and surrender the Demised Premises to Landlord. Tenant's liability for Rent upon the termination of this Lease shall cease as of the later of (y) the day following the event or damages or (z) the date upon which Tenant ceased to do business at the Demised Premises.
> [. . .]
> Unless this Lease is terminated by Landlord, Tenant shall repair and refixture the interior of the Demised Premises in a manner and to at least a condition equal to

that existing prior to its destruction or casualty and the proceeds of all insurance carried by Tenant on its property and improvements shall be held in trust by Tenant for the purpose of said repair and replacement.

(*Id.* § 16.01.) Upon the expiration of the Lease term or earlier termination of the Lease in accordance with its terms, Defendant "is required to 'quit and surrender the Demised Premises in broom clean condition' and, unless Landlord elects to retain any alterations, additions, improvements or fixtures made by or belonging to Tenant, Tenant shall, prior to the termination of the Lease, restore the Premises to the condition it was in immediately preceding such alteration, improvement, or installation." (Pls.' 56.1 ¶ 26 (quoting Lease § 2.03).) Finally, "[t]he Lease provides that '[i]f any legal fees and costs are incurred by Landlord in enforcing the terms of this Lease, then Tenant shall be liable for such reasonable legal fees and costs.'" (*Id.* ¶ 27 (quoting Lease § 20.08).)

### 2. The Alleged Conditions at the Premises and Defendant's Notice to Plaintiffs

On January 23, 2012, Defendant hired H&H Environmental to remediate a sewage backup at the Premises. (Pls.' 56.1 ¶ 28.) Defendant did not inform Plaintiffs of this until March 31, 2017. (*Id.* ¶ 29.) On February 13 and 18, 2012, Defendant hired United Sewer & Drain Services ("United Sewer") to address an issue with the sewer line connected to the Premises, and they found a "rag and tampons" in the line while cleaning it. (*Id.* ¶¶ 30–31.) On March 17, 2014, Defendant again hired United Sewer to address a sewer line issue. (*Id.* ¶ 33.) United Sewer cleaned the line and submitted an invoice to Defendant that said: "Suspect line has issues, possible belly in line." (*Id.* ¶ 34.) Defendant did not inform Plaintiffs of these service calls prior to March 31, 2017. (*Id.* ¶¶ 32, 35.)[2]

---

[2] As discussed earlier, Defendant contests this allegation because it is unsupported by the cited document—its Response to Plaintiffs' Request for Admissions. (Def.'s 56.1 ¶¶ 32, 35.) However, Defendant does not contest the substance of the factual allegation, and indeed it did

On February 26, 2015, Defendant hired Roto Rooter Plumbing Services ("Roto Rooter") to address a sewer line issue. (*Id.* ¶ 36.) Roto Rooter cleaned the sewer line and submitted an invoice to Defendant stating: "Line is a good candidate for a liner." (*Id.* ¶ 37.) On March 23, 2016, Defendant again hired Roto Rooter to address an issue with the toilet and the sewer line. (*Id.* ¶ 39.) Roto Rooter removed and reset the toilet, cleaned the sewer line, and reported to Defendant: "All good." (*Id.* ¶ 40.) Defendant did not inform Plaintiffs of Roto Rooter's service calls prior to March 31, 2017. (*Id.* ¶¶ 38, 41.)

On December 18, 2016, Marley informed Cohen by telephone that the toilet at the Premises was backed up. (*Id.* ¶ 45; Marley Dep. 34.)[3] In response to Marley's call, Cohen called a plumber to address the issue. (Pls.' 56.1 ¶ 46.) Nevertheless, on December 19, 2016, a toilet backup caused a flood at the Premises. (*Id.* ¶ 47.) Marley called Cohen three times—twice the day of the flood and once the next day—and left voicemails when Cohen did not answer. (*Id.* ¶ 49; Marley Dep. 35.) In these voicemails, Marley "just wanted to get an update" on the flooding and the plumber. (Marley Dep. 35–36; *see also* Pls.' 56.1 ¶ 49.) The day after the flood, Cohen called Defendant at the Premises and spoke to a female employee, who told him that everything had been corrected by the plumber. (Pls.' 56.1 ¶ 48.) Other than the call and the three voicemails, Marley could not recall any other communications with Plaintiffs about the toilet backup or flood. (*Id.* ¶ 49.) Nor was Marley aware of any other communication between

---

admit that it "did not provide Plaintiffs with any Repair and Maintenance Documents Concerning Hazardous Conditions at the Demised Premises" or "request or demand that Plaintiffs reimburse Defendant for any maintenance or repair cost incurred by Defendant." (Pls.' 56.1 Ex. 7 ("Response to Plaintiffs' Request for Admissions From Defendant") ¶¶ 19–20.) Thus, Defendant's objection does not create a dispute of fact. The same conclusion holds true where Defendant repeats this objection. (Def.'s 56.1 ¶¶ 38, 41.)

[3] Marley testified at one point that this call occurred on a different date, "[a]round the 14th" of December. (Marley Dep. 32.) However, he clarified that he meant "the day before" the flooding incident, which was on December 19, 2016. (*Id.* at 32–33.)

Cohen and someone else employed by Defendant concerning "any condition or event at the leased premises." (Marley Dep. 28–29; *see also* Pls.' 56.1 Ex. 26 ("Simmonds Dep.") 67 (testifying that she did not recall communicating with Cohen).) Cohen testified that he was "never contacted by anybody"—verbally or in writing—other than the December calls. (Pls.' 56.1 Ex. 5 ("Cohen Dep.") 109; *see also id.* at 59 ("Q: When was the first time after December 2016 that you became aware that Trustco claimed that there were still ongoing problems at the premises? . . . A: Never – never informed. I guess in March [2017], when they didn't pay . . . the rent on time.").)

Immediately following the flood, Defendant hired ServPro of NW and SE Dutchess County ("ServPro") to remediate the Premises. (Pls.' 56.1 ¶ 52.) Plaintiffs were not involved in hiring ServPro, and ServPro never communicated directly with Plaintiffs. (*Id.* ¶ 53.) Prior to the start of the remediation, Defendant informed ServPro that it was unaware of any mold at the Premises. (*Id.* ¶ 54.) ServPro discovered mold at the Premises on December 22, 2016. (*Id.* ¶ 55 (citing *id.* Ex. 16 at 2; *id.* Ex. 17).) On December 23, 2016, Envirocheck, a mold assessment company, was hired to perform testing at the premises. (*Id.* ¶ 56.) Envirocheck performed an assessment on December 28, 2016 and provided Defendant with a report on January 9, 2017 that included laboratory test results confirming the presence of mold at the Premises and contained a protocol for remediating the mold. (*Id.* ¶ 57.)

On January 18, 2017, ServPro informed Defendant that mold had been discovered in other areas of the Premises not previously identified. (*Id.* ¶ 58.) On January 31, 2017, Envirocheck prepared a second report confirming the presence of additional mold and containing a protocol for remediating that additional mold. (*Id.* ¶ 59.) To remediate the mold required work to be performed exclusively on the interior of the Premises. (*Id.* ¶ 60.) Plaintiffs were not

provided with a copy of either of Envirocheck's reports and were not informed of the findings prior to March 31, 2017. (*Id.* ¶ 61.) After learning that ServPro discovered additional mold and after receiving Envirocheck's January 31, 2017 report, Defendant directed ServPro to cease all remediation work at the Premises. (*Id.* ¶ 62.)

On February 14, 2017, Defendant hired Gregory Gallachi of G&P Plumbing and Heating to inspect the sanitary sewer system at the Premises and he found that, "[a]t the time, everything was working fine." (*Id.* ¶ 63.) Indeed, the second unit on the Property was rented to a deli on December 24, 2016, and the deli owner had experienced no problems with the sanitary sewer system. (*Id.* ¶ 64.) On March 2, 2017, Defendant wrote to the Office of the Comptroller of the Currency ("OCC"), a federal agency that oversees savings banks, informing OCC that it had decided to permanently close its retail branch at the Premises due to "repeated incidents that caused flooding of the interior" and the "presence of mold." (*Id.* ¶ 65.) Defendant did not inform Plaintiffs of its intention to close its retail branch at the Premises until March 28, 2017, nor did it supply Plaintiffs with a copy of its March 2 letter to OCC. (*Id.* ¶ 66.)

### 3. Defendant's Alleged Breach of the Lease

On March 28, 2017, Plaintiffs received a letter from Defendant's counsel stating that ". . . since in or about 2009," Defendant had experienced "hazardous environmental conditions" at the Premises, and that, due to the Landlord's failure to remedy these conditions, there was a "constructive eviction" from the Premises, and Defendant was therefore terminating the Lease as of March 31, 2017. (Pls.' 56.1 ¶ 67.) The identified "hazardous environmental conditions" are mold and sewage backups. (*Id.* ¶ 68.) This letter was the first written notice Plaintiffs received from Defendant complaining of a problem at the Premises, and the first notice of any type—oral or written—that mold was discovered. (*Id.* ¶ 69.) Prior to March 31, 2017, Defendant had not

complained or claimed that it had been actually evicted or excluded from any portion of the Premises. (*Id.* ¶ 70.) By no later than that date, Defendant had ceased operating its retail bank branch at the Premises. (*Id.* ¶ 71.) Therefore, on April 4, 2017, Plaintiffs notified Defendant that it had defaulted under the Lease. (*Id.* ¶ 73 (citing Ex. 27 at 2 ("Tenant is hereby notified that its abandonment and/or vacation of the Premises constitutes an Event of Default.").) On April 18, 2017, Plaintiffs sent Defendant a written notice declaring an "Event of Default" under the Lease based on its nonpayment of Rent and abandonment of the premises. (*Id.* ¶ 74; *see also* Lease § 20.01(a), (e).) When Defendant vacated the Premises, it was "a complete mess" and in "[t]errible" condition. (Letter from Michael A. Freeman, Esq. to Court (Apr. 19, 2018) Ex. 1 at 2 (Dkt. No. 68) (attaching page 37 of Cohen's deposition).)

       4. Damages

The Lease provides that any rent payment not paid within ten days of its due date is subject to a late fee of five cents for each dollar overdue. (Pls.' 56.1 ¶ 76.) It further provides that all late rent payments shall bear interest at the lesser rate of 8% per annum or the highest lawful interest rate allowed under New York law. (*Id.* ¶ 77.) "[U]pon an Event of Default by Tenant," Landlord may elect to terminate the Lease and "recover from Tenant 'all damages incurred by reason of such breach, including the cost of recovering the Demised Premises plus the total of all minimum Annual Rent, Additional Rent and other charges reserved in th[e] Lease payable over the remainder of the Lease term discounted to net present value utilizing a 6% discount rate.'" (*Id.* ¶ 78 (quoting Lease § 20.02(b)).)

On November 14, 2017, Plaintiffs sent Defendant a written notice invoking the Landlord's remedies under § 20.02(b), declaring it was exercising its contractual right to terminate the Lease and accelerate all future rent charges as of November 15, 2017, and

demanding immediate payment of the rent and other charges due. (*Id.* ¶ 79.) The total amount of unpaid rent due under the Lease, discounted to net present value using a discount rate of 6%, inclusive of interest and late fees through November 15, 2017, is $912,650.41. (*Id.* ¶ 80.) This amount was calculated in an unrebutted expert report from Bruce Balsam, a Certified Public Accountant. (*Id.* (citing *id.* Ex. 30 at Ex. B §§ 4–5 ("Balsam Report")).) Plaintiffs also obtained two estimates to restore the Premises to the condition it was in immediately preceding Defendant's alterations to the Premises, the lesser of which is $36,000. (Pls.' 56.1 ¶ 81.) Plaintiffs also submitted documentation of the attorneys' fees, costs, and expenses incurred in enforcing the terms of the Lease. (*Id.* ¶¶ 82–84.) Balsam calculated the interest on all unpaid sums to accrue at the rate of $200.03 per day based on the rate of 8% per annum. (Balsam Report § 4(2)(d).)

C. Procedural Background

Plaintiffs initiated this Action by filing a Complaint on April 21, 2017. (Compl. (Dkt. No. 1).) After receiving an extension, (Dkt. No. 9), Defendant filed an Answer with Counterclaims on June 1, 2017, (Answer (Dkt. No. 10). Plaintiffs filed a reply on June 12, 2017. (Reply (Dkt. No. 13).) On June 13, 2017, the Parties stipulated to a withdrawal of Defendant's demand for a jury trial with respect to its counterclaims. (Dkt. No. 14.) On June 19, 2017, Plaintiffs filed a letter requesting that the Court expedite disposition of this Action, including scheduling a Rule 16 conference, because of Cohen's age, (Letter from Michael A. Freeman, Esq. to Court (June 19, 2017) (Dkt. No. 15)), which the Court granted, (Dkt. No. 16).

The Court held an initial conference on July 19, 2017, (*see* Dkt. (entry for July 19, 2017)), and adopted a case management and scheduling order the next day, (Case Management and Scheduling Order (Dkt. No. 20)). Amidst the discovery process, on October 6, 2017, the

Parties stipulated to, and Magistrate Judge Smith approved, permitting Plaintiffs to file an amended complaint. (Dkt. No. 38.) Plaintiffs filed the operative Amended Complaint on October 6, 2017, (Am. Compl.), and Defendant filed its Amended Answer and Counterclaim on October 11, 2017, (Am. Answer). Plaintiffs filed an Amended Answer to Defendant's Amended Answer and Counterclaim on October 12, 2017. (Dkt. No 43.)

On November 30, 2017, Plaintiffs filed a pre-motion letter indicating the grounds on which they would move for summary judgment. (Letter from Michael A. Freeman, Esq. to Court (Nov. 30, 2017) (Dkt. No. 48).) Defendant responded on December 5, 2017. (Letter from Adam K. Kurland, Esq. to Court (Dec. 5, 2017) (Dkt. No. 50).) The Court held a pre-motion conference on December 14, 2017 and adopted a briefing schedule. (*See* Dkt. (entry for Dec. 14, 2017); Mot. Scheduling Order (Dkt. No. 51).)

Plaintiffs filed the Motion for Summary Judgment and accompanying papers on December 26, 2017. (Not. of Mot.; Pls.' 56.1; Decl. of Bernard Cohen (Dkt. No. 55); Decl. of Michael A. Freeman, Esq. in Supp. of Mot. for Summ. J. ("Freeman Decl.") (Dkt. No. 56); Pls.' Mem. of Law in Supp. of Mot. for Summ. J. ("Pls.' Mem.") (Dkt. No. 57).) Defendant filed its opposition and accompanying papers on January 22, 2018. (Def.'s Mem; Def.'s 56.1.) On January 24, 2018, Plaintiffs filed a pre-motion letter indicating the grounds on which they would move to strike evidence submitted by Defendant in it opposition, (Letter from Michael A. Freeman, Esq. to Court (Jan. 24, 2018) (Dkt. No. 60)), which Defendant opposed, (Letter from Adam K. Kurland, Esq. to Court (Jan. 29, 2018) (Dkt. No. 62)). The Court permitted Plaintiffs five additional pages in their reply brief to address the evidentiary issues. (Dkt. No. 64.) Plaintiffs also requested permission to exceed the page limit in their reply brief, (Letter from Michael A. Freeman, Esq. to Court (Jan. 29, 2018) (Dkt. No. 61)), which the Court granted,

(Dkt. No. 63). Plaintiffs filed their reply on February 5, 2018. (Pls.' Reply Mem. of Law in Supp. of Mot. for Summ. J. ("Pls.' Reply") (Dkt. No. 65); *see also* Reply Decl. of Michael A. Freeman, Esq. in Supp. of Mot. for Summ. J. ("Freeman Reply Decl.") (Dkt. No. 66).) On February 6, 2018, Plaintiffs requested that the Court expedite its decision on the instant Motion in light of Cohen's advanced age of 92 and a pending foreclosure action in state court. (Letter from Michael A. Freeman, Esq. to Court (Feb. 6, 2018) (Dkt. No. 67).) On April 27, 2018, the Court ordered the Parties to provide supplemental briefing regarding Plaintiffs' requested damages award for annual rent during the first Option Term, (Order (Dkt. No. 69)), which they simultaneously filed on May 11, 2018, (Dkt. Nos. 73, 74).

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River, N.J. v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an

essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . ."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of City of New York*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported

claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).  However, a district court should consider only evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'"  *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

B.  Analysis

Plaintiffs argue that they are entitled to summary judgment on their breach of contract claim and that Defendant's counterclaim for constructive eviction fails.  (Pls.' Mem. 4–9.) Under New York law, a plaintiff must establish four elements to sustain a breach of contract claim: "(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages."  *Amto, LLC v. Bedford Asset Mgmt., LLC*, 168 F. Supp. 3d 556, 573 (S.D.N.Y. 2016) (quoting *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011)); *see also McCabe v. ConAgra Foods, Inc.*, 681 F. App'x 82, 84 (2d Cir. 2017) (same).  Defendant raises an affirmative defense of constructive eviction and disputes the third element—damages. (Def.'s Mem. 7–18.)[4]

---

[4] Defendant does not explicitly argue that Plaintiffs failed to perform their obligations under the Lease.  Instead, its brief contains sections regarding constructive eviction, damages, and attorney's fees, and it does not otherwise indicate that its discussion about obligations under the Lease is anything other than a dispute of fact as to its constructive eviction defense.  (*See* Def.'s Mem.)  Thus, to the extent that Defendant's counseled brief attempts to raise the argument that Plaintiffs failed to perform their obligations under the Lease, (*see* Def.'s Mem. 10, 20), the Court finds it "not sufficiently argued" to merit independent discussion outside of the constructive eviction context.  *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998); *see also*

### 1. Constructive Eviction

"[I]t is well settled that a commercial tenant may be relieved of its obligation to pay the full amount of rent due where it has been . . . constructively evicted from either the whole or a part of the leasehold." *Capogrosso v. Lecrichia*, No. 07-CV-2722, 2010 WL 2076962, at *7 (S.D.N.Y. May 24, 2010) (internal quotation marks omitted). "[C]onstructive eviction exists where, although there has been no physical expulsion or exclusion of the tenant, the landlord's wrongful acts substantially and materially deprive the tenant of the beneficial use and enjoyment of the premises." *Barash v. Pennsylvania Terminal Real Estate Corp.*, 256 N.E.2d 707, 710 (N.Y. 1970); *see also Szewczuk v. Stellar 117 Garth, LLC*, No. 09-CV-1570, 2012 WL 8141900, at *5 (S.D.N.Y. Sept. 4, 2012) (same), *aff'd*, 541 F. App'x 30 (2d Cir. 2013). In other words, "[a] constructive eviction occurs when a tenant . . . is unable to use the area for the purpose intended." *Capogrosso*, 2010 WL 2076962, at *6–7 (collecting cases) (internal quotation marks omitted). "The reason for the rule . . . is that there was a failure of consideration [because] the tenant was deprived of the premises by the wrongful act of the landlord." *56-70 58th St. Holding Corp. v. Fedders-Quigan Corp.*, 159 N.E.2d 150, 155, *adhered to on reh'g*, 162 N.E.2d 747 (N.Y. 1959) (internal quotation marks omitted). Defendant bears the burden of proving this affirmative defense. *See NYCHA Coney Island Houses v. Ramos*, 971 N.Y.S.2d 422, 430 (Civ. Ct. 2013); *One Whitehall Co. v. Wang Labs., Inc.*, No. 87-CV-2118, 1989 WL 120351, at *1 (S.D.N.Y. Sept. 29, 1989) (same).

---

*Sioson v. Knights of Columbus*, 303 F.3d 458, 460 (2d Cir. 2002) ("Perhaps counsel for Appellant intends that we form an argument for him, by looking into the record to document the 'facts' posited in his 'statement of the case,' and then examining various combinations of these facts in the light of the legal doctrines he later mentions. But that is simply not our job, at least in a counseled case."). In any event, the analysis is the same with respect to the constructive eviction defense, in that it requires the Court to interpret the Lease. Defendant cites no case or record evidence to the contrary.

Defendant's constructive eviction defense is based upon Plaintiffs' alleged breach of a duty to repair the defective conditions on the Premises—namely, the mold and sewage issues. (Pls.' 56.1 ¶ 68.)  "A landlord's breach of its duty to repair may give rise to a claim for constructive eviction if the breach results in a substantial and material deprivation of plaintiff's use of its premises."  *N.N. Int'l (USA) Corp. v. Gladden Properties, LLC*, 41 N.Y.S.3d 720, 2016 WL 3747428, at *2 (Sup. Ct. 2016).  However, "in dealing with nonresidential leases . . . it is well-settled . . . that there is no implied obligation or duty on the part of the landlord to make repairs to the leased premises"; rather, a landlord's obligation 'to repair . . . demised premises rests solely on express covenant.'"  *2306-2326 Arthur Ave., LLC v. Doda*, 61 N.Y.S.3d 193, 2017 WL 3122918, at *3 (Civ. Ct. 2017) (quoting *Witty v. Matthews*, 52 N.Y. 512, 514 (1873)); *see also Polak v. Bush Lumber Co.*, 566 N.Y.S.2d 757, 758 (App. Div. 1991) (same).  The interpretation of any such covenant in the Lease is "a question of law for the [C]ourt, and a dispute on such an issue may properly be resolved by summary judgment."  *Omni Quartz, Ltd. v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002); *see also N.N. Int'l (USA) Corp.*, 2016 WL 3747428, at *3 ("The landlord's repair obligations are questions of law to be determined by the plain and unambiguous terms of the lease." (citing *Searle Blatt & Co. v. Zurich Holding Co.*, 659 N.Y.S.2d 472, 472 (App. Div. 1997))).

The Lease provides that "Landlord shall not be required to make any repairs or improvements of any kind . . . except for necessary exterior or structural repairs."  (Lease § 7.01.)  It further states that "Tenant shall, at its own cost and expense, take good care of and make necessary non-structural repairs to the interior of the Demised Premises, and the fixture and equipment therein and appurtenances hereto."  (*Id.*)  These covered parts of the "interior"

21

include "floor coverings," "interior walls," "plumbing," and "sewage facilities." (*Id.*) And, "Tenant . . . waives any rights it may have to make repairs or perform maintenance . . . for the account of Landlord." (*Id.*)

The Lease clearly categorizes the alleged mold, sewage, and toilet defects inside the Premises as "interior" issues that Defendant, not Plaintiffs, must repair. Defendant does not argue that the Lease is ambiguous; rather, it argues that there is a dispute of material fact regarding whether the repairs needed here were structural and exterior, because the admittedly internal problems were allegedly *caused by* external defects. (Def.'s Mem. 10.)[5] However, Defendant does not even attempt to describe the alleged defects with any specificity such that they could plausibly be categorized any way other than as interior or non-structural ones, instead describing them only as "issues with defective plumbing, such as sewage and toilet backups" and mold. (Def.'s Mem. 13–14.) On the other hand, the Lease indicates that equipment and fixtures inside the Premises, such as toilets, walls, and flooring, are considered "interior." (Lease § 7.01.)

Moreover, Defendant submitted no evidence from which a trier of fact could conclude that the mold inside the Premises and the clogged toilets and flooding were caused by exterior or structural deficiencies. It is undisputed that the mold was confined to the interior of the Premises, where the work required to remediate it would be exclusively performed. (Pls.' 56.1 ¶ 60.) Defendant cites *no* evidence for its assertion that this interior mold "resulted from deficiencies at the exterior of the Premises." (Def.'s Mem. 10; *see also id.* at 20 (same).) Indeed, it is not even clear from Defendant's Memorandum of Law whether it is arguing that the

---

[5] Defendant also argues that there is a genuine dispute of fact regarding whether the repairs were "necessary." (Def.'s Mem. 10.) But, "necessary" qualifies "exterior or structural" in the Lease, (Lease § 7.01), and thus this argument fails for the same reasons identified below: Defendant cites no evidence suggesting that the repairs here were exterior or structural.

mold was caused by flooding, which was in turn caused by the sewage issues, or whether the mold was a separately occurring problem.

Defendant also argues that "[t]he cause of the backups is a[] triable issue of fact," citing two exhibits not referenced in its 56.1 Statement. (Def.'s Mem. 21.) First, Defendant cites the deposition testimony of Amy Anderson, Trustco's regional manager, who testified that a "smell" at the branch "was fairly consistent from a freeze and a thaw," meaning that "[w]hen [they] got [their] first freeze the branch would flood and when the first thaw hit [they] would get it again." (Def.'s Mem. 21 (citing *id.* Ex. 9 ("Anderson Dep.") 20–21.) Second, Defendant cites the testimony of a Roto Rooter plumber, Richard Skjerli, that, based on an unidentified or described "video," the sewer line may have "a belly or sag" preventing the water from "flow[ing] freely." (Def.'s Mem. 21 (citing *id.* Ex. 10 ("Skjerli Dep.") 48).) Even if this lay testimony describes when or how flooding occurs at the Premises, Defendant does not explain how this testimony shows that the needed repairs were "necessary exterior or structural repairs," which exclude "plumbing" and "sewage facilities." (Lease § 7.01.) That the flooding occurred with weather changes or that the sewer line had a belly does not create a dispute regarding whether the needed *repairs* were external or structural, rather than ones which could be performed exclusively inside the Premises. For example, although the lateral sewer line indisputably connects both units on the Property to the local sewer system, (Pls.' 56.1 ¶ 9), Defendant provided no explanation, let alone evidence creating a dispute of material fact, as to the line's structure or what repairs were necessary to prevent internal flooding and toilet backups—both of which, standing alone, are merely plumbing problems with a fixture inside the Premises that, under the Lease, Defendant

must repair, (Def.'s Mem. 14).[6]  Indeed, it is undisputed that at least one sewer backup in 2012

was caused by the presence of "rag and tampons" in the sewer line, (Pls.' 56.1 ¶ 31), before the

second unit on the Property—and the only other unit connected to the sewer line—was occupied,

(*id.* ¶ 64), suggesting that it was Defendant's conduct, not a structural or external problem with

the sewer line, causing the backups.  And, after renting the other unit, the deli there experienced

no problems with the sanitary sewer system.  (*Id.* ¶ 64.)  Simply put, Defendant provided no

context for the evidence it cites such that it could create a material dispute of fact.  *See Payne v.*

*State of New York Power Auth.*, 997 F. Supp. 492, 499 (S.D.N.Y. 1998) (finding that statistics

did "not create a material dispute of fact" because the "[p]laintiff [did] not proffer[] any

information to explain or provide context for the . . . reports, . . . adduced no evidence which

---

[6] Defendant could have, but failed to, submit expert testimony as to the cause of the mold and sewage issues.  Of course, such testimony would not be necessary if the issue of causation here were one "where jurors are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training." *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004) (internal quotation marks omitted).  However, Defendant now argues that it will introduce at trial "evidence from a plumber who possesses special training and knowledge related to the causes of the recurring hazardous conditions at the Premises." (Def.'s Mem. 12.)  While this statement acknowledges the potential necessity of such evidence, it comes too late.  Defendant failed to submit a report or affidavit from this purported expert in opposition to the motion for Summary Judgment, and it is entirely unclear whether Defendant even identified this witness in discovery, as required by the Federal Rules of Civil Procedure.  (*See* Case Management & Scheduling Order (Dkt. No. 20).)  *See* Fed. R. Civ. P. 26(a)(2); Fed. R. Civ. P. 37(c)(1). This illusive promise of an expert will therefore not generate a dispute of fact at summary judgment.

Moreover, to the extent Defendant is relying on Anderson's testimony as expert testimony regarding the cause of the sewage backups, (Def.'s Mem. 21 (citing Anderson Dep. 21 (testifying that it would flood consistently when the branch "got [its] first freeze" and then again "when the first thaw hit"))), she testified that she has no experience or special knowledge about sewers or plumbing, (Anderson Dep. 16–17).  Similarly, Defendant cites the testimony of Skjerli, that, based on an unidentified "video," the sewer line may have "a belly or sag" preventing the water from "flow[ing] freely," (Skjerli Dep. 48), but makes no attempt to qualify this witness as an expert, (Def.'s Mem. 21).

would permit rational evaluation of the raw figures in the reports," and did not "attempt in her . . . motion papers to discuss the significance of the figures"), *aff'd*, 173 F.3d 845 (2d Cir. 1999).

Therefore, because Defendant has not created a dispute of fact regarding whether the alleged defects were "exterior" or "structural" ones that Plaintiffs were required to repair under the Lease, Defendant's constructive eviction claim based on that failure to repair fails as a matter of law. *See Hidden Ponds of Ontario, Inc. v. Hresent*, 622 N.Y.S.2d 168, 168 (App. Div. 1994) ("Although [the] plaintiff presented evidence of problems with water quality, the lease obligated plaintiff to maintain the water supply equipment inside the building and to pay the costs of water purification."); *Silver v. Moe's Pizza, Inc.*, 503 N.Y.S.2d 86, 88 (App. Div. 1986) (rejecting constructive eviction defense based on failure to obtain a certificate of occupancy because the plaintiffs never promised to do so under the lease); *Friedman-White Realty Co. v. Garage Dev. Corp.*, 223 N.Y.S. 839, 842 (Mun. Ct. 1927) (rejecting constructive eviction claim because the tenant expressly agreed to make all repairs in the lease); *see also Bd. of Managers of Saratoga Condo. v. Shuminer*, 51 N.Y.S.3d 34, 35 (App. Div. 2017) (affirming summary judgment for the landlord because the constructive eviction claim "[wa]s barred by the exculpatory provisions of the lease"); *Mack Kanner & Sons, Inc. v. Abramowitz*, 183 N.Y.S.2d 593, 595 (Sup. Ct. 1959) (noting that the tenant failed to satisfy its burden of proof for constructive eviction claim because "no proof was offered as to the source of the water leak" and "the general duty to repair [wa]s placed upon the tenant" under the lease). Put differently, Defendant has failed to show that these alleged conditions were caused by a wrongful act of Plaintiffs—a critical element of a constructive eviction defense. *See Barash*, 256 N.E.2d at 710 (requiring that "the landlord's wrongful acts substantially and materially deprive[d] the tenant of the beneficial use and enjoyment of the premises"); *905 5th Assocs., Inc. v. 907 Corp.*, 851 N.Y.S.2d 393, 395–96

(App. Div. 2008) (rejecting constructive eviction claim because the "plaintiffs failed to present any evidence that the damage was in any way caused by the cooperative . . . [o]ther than by speculation"); *Szewczuk*, 2012 WL 8141900, at *5 ("As [the] [p]laintiffs fail to show any wrongful conduct on the part of [the] [d]efendants that would constitute a constructive eviction, [the] [d]efendants are entitled to summary judgment on this claim.").[7]

### b.  Notice

Even assuming Plaintiffs were required to make these repairs under the Lease, Defendant has also not created a dispute of fact regarding whether Plaintiffs were properly notified of the defective conditions but failed to repair them.  *See N.N. Int'l (USA) Corp.*, 2016 WL 3747428, at *3 ("Because, in this case, [the] plaintiff's constructive-eviction claim is based on the landlord's duty to repair, [the] plaintiff must also show that the landlord knew, or should have known, about the need for repairs." (citing *Thomas v. Kingsland*, 108 N.Y. 616, 617 (1888))).[8]  It is undisputed

---

[7] Accordingly, Defendant's counterclaim for the money paid to ServPro for mold remediation also fails.  (Pls.' 56.1 Ex. 2 at 5–6.)  Because the mold remediation was exclusively confined to the interior of the Premises, (Pls.' 56.1 ¶ 60), Defendant was obligated to undertake such a repair "at its own cost and expense," (Lease § 7.01).  Furthermore, because the mold was not "caused by the wrongful act or omission or negligence of Landlord," Plaintiffs need not indemnify Defendant for "expenses in connection with . . . property damage arising from" the mold.  (Lease § 14.01(b).)

[8] Under New York law, a tenant claiming a landlord breached the warranty of habitability must show that the landlord "had actual or constructive notice of the hazardous condition and a reasonable opportunity to remedy it, but failed to do so."  N.Y. Real Prop. Law § 235-b (McKinney) Supplementary Practice Commentaries by Dan M. Blumenthal (quoting *Taggart v. Fandel*, 50 N.Y.S.3d 661 (App. Div. 2017) (alteration omitted)).  "While the warranty of habitability provided by . . . § 235-b does not apply to commercial tenants," like Defendant, "there is relief available to such tenants for partial constructive eviction."  *Id.* at Practice Commentaries by Rudolph de Winter and Larry M. Loeb (citing *Manhattan Mansions v. Moe's Pizza*, 561 N.Y.S.2d 331 (Civ. Ct. 1990)).  The Parties do not cite, and the Court was unable to find, any additional New York cases describing the notice standard for commercial constructive eviction cases, as opposed to warranty of habitability cases, in any meaningful detail.  However, the cases cited in this Opinion demonstrate that notice must be shown.  *See, e.g.*, *Manhattan Mansions*, 561 N.Y.S.2d at 333–34 (finding constructive eviction where "[i]t was not disputed that the petitioner was aware of the reoccurrence of the leak . . . and had a duty to repair the leak.

that Defendant did not inform Plaintiffs about the service calls from H&H Environmental,

United Sewer, or Roto Rooter related to the sewer line until March 2017, when Cohen received a

letter from Defendant's attorney.  (Pls.' 56.1 ¶¶ 29, 32, 35, 38, 41, 51; *see also id.* Ex. 7 ¶¶ 19–

20.)  Similarly, it is undisputed that Plaintiffs had no contact with ServPro, the mold remediator,

and were not provided with a copy of Envirocheck's reports regarding mold at the Premises prior

to March 2017.  (*Id.* ¶¶ 53, 61; *see also* Cohen Dep. 75–76 (testifying that he became aware of

the mold and sewage problems "as a result of [Defendant's attorney's] letter" and "[t]hey didn't

complain about" mold until after the flood); Marley Dep. 103–104 (testifying that he has not

seen or heard any evidence indicating Plaintiffs were aware of mold at the Premises prior to

March 27, 2017).)[9]  Furthermore,  Defendant concedes that it failed to comply with the notice

provisions under the Lease, which requires Defendant to send *written* notice of "any

environmental concerns" that it becomes aware of and any "defects [in the Premises] or in any

fixtures or equipment" in order to permit Plaintiffs to cure.  (Lease §§ 5.07(b), 13.01(a), 14.06.)

This further undermines Defendant's claim that Plaintiffs breached their duty to repair under the

---

The leak was not corrected."); *36 Main Realty Corp. v. Wang Law Office, PLLC*, 19 N.Y.S.3d 654, 658 (App. Term 2015) (affirming trial court's finding "that the necessary repairs had been timely made after notice" in rejecting constructive eviction claim); *see also* Mark S. Dennison, *Commercial Tenant's Remedies Where Landlord Fails to Keep Premises in Condition Fit or Suitable for Commercial Use*, 57 Am. Jur. Proof of Facts 3d 127 § 17 (2000) (noting that to prove constructive eviction, "the tenant must have provided the landlord with adequate notice of the alleged defects and allowed the landlord a reasonable amount of time to remedy the defects before moving out").  In any event, even if not an explicit element of a constructive eviction defense, it is not clear to the Court how Defendant could prove Plaintiffs' *wrongful* acts rendered the Premises unsuitable for their intended purposes absent evidence that that Defendant was aware of the need to repair but failed to make such repairs.  *See Barash*, 256 N.E.2d at 710 (requiring that "the landlord's wrongful acts substantially and materially deprive[d] the tenant of the beneficial use and enjoyment of the premises").

[9] As discussed earlier, these facts from Plaintiffs' 56.1 Statement are undisputed because Defendant failed to dispute them by contradicting them or by citing to the record, and instead only argued, incorrectly, that the allegations were not supported by the cited parts of the record.

Lease.  *See, e.g.*, *USI Ins. Servs. LLC v. Miner*, 801 F. Supp. 2d 175, 182 (S.D.N.Y. 2011)

(collecting cases applying New York law to find that "where no notice was given as set forth

under [a contract], there can be no breach of the [contract] because [the] defendant was not

afforded the opportunity to cure the defect"); *Pac. Coast Silks, LLC v. 247 Realty, LLC*, 904

N.Y.S.2d 407, 414 (App. Div. 2010) ("Because no [written] notice was served, the tenant is not

entitled to relief based on a claim that the landlord was in default of the lease.").[10]

However, even considering the evidence cited in Defendant's Memorandum of Law, but

not provided in its 56.1 statement, *but see Baity*, 51 F. Supp. 3d at 418, it does not create a

genuine dispute of fact regarding whether Plaintiffs had notice of a problem with the Premises

that was not adequately addressed.  (Def.'s Mem. 9–10, 20.)  Defendant first cites an e-mail from

Wirth, an employee working at the Premises, to Marley, dated December 19, 2016, stating:

> As per follow up with the flood this am. . . . Plumber here now snaking out pipes.
> He stated that there is sludge in pipes. . . . Plumber states he needs a high pressure
> jet spray to get sludge out and it will probably happen again if landlord doesn't do
> anything about it.  Plumber states that landlord needs to replace pipes and he is just
> placing a bandaid on the problem.  . . . Landlord is refusing to get it done.  We
> cannot work here under these conditions.

---

[10] Defendant argues that *USI Ins. Servs. LLC* excuses its noncompliance with the Lease's
notice provisions, because it notes that "in certain limited circumstances, courts should not
construe the notice provision as if it were a common law pleading requirement under which
every slip would be fatal."  (Def.'s Mem. 11 (quoting 801 F. Supp. 2d at 182).)  However, this
statement is based on a citation to a Second Circuit case holding that where the plaintiff sent a
letter to the defendant stating that it considered the contract to have been materially breached,
pointing to a paragraph of the contract that did not ultimately form the basis of the plaintiff's
recovery, it would be "hypertechnical" to conclude this notice was insufficient merely because it
did not cite the exact provision of the contract.  *USI Ins. Servs. LLC*, 801 F. Supp. 2d at 184
(citing *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 925 (2d Cir. 1977)).
That situation is inapplicable here, where it is undisputed that Defendant never alerted Plaintiffs
that it believed them to be in breach of the Lease or that there were defective external or
structural conditions that needed repair.  (Pls.' 56.1 ¶¶ 32, 35, 38, 41.)  *See USI Ins. Servs. LLC*,
801 F. Supp. at 184 (finding that *Contemporary Mission, Inc.* "is far different from the facts
proffered" because "[t]he record . . . [wa]s devoid of any statements by [the plaintiff] . . .
indicating that [he] believed there was a breach of the [contract] or that he was triggering the
provisions . . . that would allow [the defendant] an opportunity to cure any alleged defects").

(Def.'s Mem. Ex. 4.)  This email says nothing about what efforts were made to notify Plaintiffs, and specifically Cohen, regarding an issue with the pipes, let alone the sludge issue.  To the extent Defendant is relying on the phrase "Landlord is refusing to get it done" to raise a dispute of fact regarding efforts to notify Cohen about the pipe sludge, this assertion simply lacks enough specific facts or other supporting evidence in the record to do so.  *See Wrobel*, 692 F.3d at 30 (requiring a nonmovant "to create more than a metaphysical possibility that his allegations were correct" and instead requiring "specific facts showing that there is a genuine issue for trial" (emphasis and internal quotation marks omitted)); *Wright*, 554 F.3d a 266 (requiring a nonmovant to oppose a motion for summary judgment that "is properly supported by . . . evidentiary materials" with more than "allegations").

Rather, it is undisputed that Cohen was informed about a toilet backup on December 18, 2016, and subsequently called a plumber to address the issue.  (Pls.' 56.1 ¶¶ 45–46; *see also* Marley Dep. 34–35 (describing Cohen's actions as "responsive" and "helpful" and stating that Cohen in fact contacted a plumber); Def.'s Mem. Ex. 4 (email reply to the email in question from Marley to Wirth, stating that "Landlord told me he was paying for the plumber").)  After the flood on December 19, 2016—the day the email in question was sent—Marley left Cohen two voicemails, and left another one the next day, "to get an update" on the flooding and the plumber.  (Pls.' 56.1 ¶ 49; Marley Dep. 35–36; Marley Aff. ¶ 6.)[11]  Cohen then called the

---

[11] As Defendant notes, (Def.'s Mem. 9), Marley avers that he "personally notified . . . Cohen numerous times of the need for repairs," but, as discussed earlier, to be consistent with his deposition testimony, this statement is referring to the December 18 phone call about the toilet clog, and the voicemails he left "to get an update" on the plumber, (Marley Aff. ¶ 6; *see also id.* ¶¶ 7–9).  Moreover, for the reasons stated earlier, the Court will not consider Marley's conclusory allegation, without any identified basis in fact or personal knowledge, that "Plaintiffs knew about the need for repairs due to the hazardous conditions, but repeatedly failed to remedy them."  (*Id.* ¶ 5.)

Premises that next day, December 20, 2016, and spoke to an employee of Defendant, who told him the plumber had corrected everything. (Pls.' 56.1 ¶ 48.) Cohen was "never contacted by anyone" regarding ongoing problems at the premises afterwards, (Cohen Dep. 109; *see also id.* at 59 (same)), and Marley, the witness designated by Defendant as to testify regarding "[a]ny and all communications with Plaintiffs about the conditions" at the Premises, "including requests . . . to . . . repair," (Pls.' 56.1 ¶ 44), is unaware of any other communication between Cohen and someone employed by Defendant regarding such conditions, (Marley Dep. 28–29, 31–32). Thus, the undisputed evidence, even construing the cited email in the light most favorable to Defendant, is that Cohen was contacted about a toilet clog issue, sent a plumber to fix it, and was told that the plumber had resolved all issues the day after the flood. No evidence even *suggests* he was contacted about a sludge issue requiring total replacement of the pipes or any other ongoing sewage issue.

The other evidence cited by Defendant is similarly unavailing because it fails to show what Plaintiffs were contacted about and when. For example, Defendant cites three maintenance e-tickets documenting internal complaints from employees regarding water and mold on the Premises. (*See* Def.'s Mem. Ex. 5.) Although some of the maintenance responses indicate that someone would try to or did try to attempt to contact Cohen, they do not say what was communicated, let alone who was contacted by whom or when any such contact was made. (*Id.* at 1 (responding to odor and mildew complaint on December 5, 2016 with "Landlord has been contacted and cleaners will do what they can Friday night"); *id.* at 2 (responding to complaint about smell of mildew and water coming in on December 8, 2016 with "We have called the Landlord."); *id.* at 3 (responding to complaint on December 19, 2016 about flooding and mold with "The plumber and cleaner will be going here to take care of the issues at hand . . . we'll be

trying to further contact the landlord and finally get this issue taken care of so it doesn't happen

again. . . . The plumber is also going to clear your line for the toilet so hopefully that doesn't get

backed up again.").)  Indeed, the author of these maintenance responses testified that she did not

recall ever communicating directly with Plaintiffs on any subject.  (Pls.' Dep. 56.1 ¶ 43.)

Moreover, even assuming these notices create a dispute about whether Cohen was informed of

the sewage and mold problems, it is undisputed that Cohen responded by hiring a plumber, and

was told that this resolved the issue as of December 20, 2016.  (*Id.* ¶¶ 45–46, 48.)  Thus, a

reasonable trier of fact could not find that Cohen failed to repair the premises or was on notice

that the problems continued based solely on these internal maintenance requests.  *Cf. Bostany v.*

*Trump Org. LLC*, 931 N.Y.S.2d 280, 282 (App. Div. 2011) (denying summary judgment on

partial constructive eviction claim because the "[p]laintiff's proof, which included a subtenant

loss report, subtenant affirmations, and letters of complaint sent by [the] plaintiff to an executive

of [the defendant organization], . . . established issues of fact that defendants may have repaired,

but failed to rectify, the subject problem, in accordance with [the lease]").[12]

---

[12] It is also worth noting that Defendant asserted that the "hazardous environmental conditions" have been occurring "since in or about 2009" in its letter to Plaintiffs on March 27, 2017.  (Pls.' 56.1 Ex. 25.)  Plaintiffs argue that Defendant's delay in quitting the Premises—until March 2017—was thus unreasonable, barring its constructive eviction defense.  (Pls.' Mem. 9.) Defendant responds only with a conclusory assertion, absent any record citation, that it "did not fail to abandon the premises with reasonable promptness," and argues that the cited case is inapplicable.  (Def.'s Mem. 12–13.)  The failure to actually argue this point alone could permit the Court to accept Plaintiffs' argument in this counseled case.  *See, e.g.*, *Sioson*, 303 F.3d at 460 (declining to consider an argument where the brief did not contain "the requisite combination of authorities and putative facts").  In any event, when the facts regarding the timing of a tenant's abandonment of the leased premises are undisputed, the issue is one of law for the Court to decide.  *See Leider v. 80 William St. Co.*, 255 N.Y.S.2d 999, 1001 (App. Div. 1964).  And, although courts have found that abandonment of large operations, perhaps such as a bank branch, may justify "a delay of even several months," the alleged delay here was many *years*—whether the conditions first arose in 2009 or even when the first remediation work was performed in 2012.  *S.E. Nichols, Inc. v. New Plan Realty Trust*, 553 N.Y.S.2d 359, 360 (App. Div. 1990) (denying summary judgment as a matter of law on the reasonableness of a delay because

### c.  Waiver

Finally, Plaintiffs argue that Defendant waived its right to quit the premises and assert constructive eviction as a defense in the Lease.  (Pls.' Mem. 8.)  Under New York Real Property Law § 227, when a leased building "is destroyed or so injured by . . . any . . . cause as to be untenable, and unfit for occupancy, *and no express agreement to the contrary has been made in writing*, the lessee . . . may . . . quit and surrender possession of the leasehold premises" without liability for rent thereafter.  N.Y. Real Prop. Law § 227 (emphasis added).  Here, § 16.01 of the Lease states that if the Premises are "rendered wholly untenantable," the "Landlord may either [(1)] elect to repair the damage," provided it is not interior damage which the Tenant is responsible for repairing under the Lease, or (2) "may cancel th[e] Lease by notice of cancellation," after which the "Lease shall expire and Tenant shall vacate and surrender" the Premises.  (Lease § 16.01.)  The Lease further provides that "Tenant's liability for Rent upon the termination of th[e] Lease shall cease" either the day following the casualty or when "Tenant ceased to do business at the Demised Premises," and that, "[i]n the event Landlord elects to repair the damage . . . any abatement of Rent shall end upon the date" the repairs are completed. (*Id.*)  However, "there shall be no abatement of Rent" if the damage was "caused by the negligence of Tenant" or an agent thereof.  (*Id.*)  And, "[u]nless t[he] Lease is terminated by Landlord, Tenant shall repair and refixture the interior of the Demised Premises in a manner and to at least condition equal to that existing prior to its destruction or casualty."  (*Id.*)

---

"abandonment of a department store in an orderly manner may be a lengthy process").  Thus, Defendant's delay in both notifying and quitting the premises further undermines its constructive eviction defense.  *Cf. Incredible Christmas Store-New York, Inc. v. RCPI Tr.*, 763 N.Y.S.2d 280, 282 (App. Div. 2003) ("Nor was plaintiff's delay in vacating the premises unreasonable as a matter of law where it appears that attempts were initially made to resolve the dispute without litigation." (citation omitted)).

Put simply, while the Lease provides Plaintiffs with the right to terminate the Lease in the event of a casualty damaging or destroying the Premises—such as flooding—it does not provide Defendant with a corresponding right to terminate. The only remedy the Lease provides Defendant is the abatement of rent during the period the Premises are untenantable. And, the Lease further indicates that if the Landlord does *not* terminate the Lease in the event of such a casualty, Defendant is responsible for repairing the interior. Therefore, in light of these provisions, and Defendant's failure to proffer *any* other interpretation of the Lease, (*see* Def.'s Mem. 12), Defendant waived its right to quit the premises and invoke a constructive eviction defense. *See Butler v. Kidder*, 87 N.Y. 98, 105, 1881 WL 13050 (1881) (finding "the plain import" of a lease providing for abatement of rent "while repairs are being made by the landlord" from injury by fire that "there shall be no right of surrender"); *RVC Assocs. v. Rockville Anesthesia Grp.*, 700 N.Y.S.2d 231, 232 (App. Div. 1999) (dismissing constructive eviction counterclaim because, in light of the lease not providing tenants with the option to terminate the lease if the premises became untenantable and instead providing for rent abatement, the tenant defendants "waived [their] right[s] to surrender possession, otherwise available under Real Property Law § 227, and agreed that the lease provisions would govern"); *Schwartz, Karlan & Gutstein v. 271 Venture*, 568 N.Y.S.2d 72, 73 (App. Div. 1991) (finding that a lease "proscribe[d] constructive eviction as a basis for terminating the lease," because it provided that "[i]n the event of a [casualty] rendering the premises unusable, the tenant's sole remedy is a rent abatement during the restoration period").

### 2. Damages

Plaintiffs request damages in the amount of $912,650.41 for unpaid rent, discounted by 6% to net present value, and inclusive of interest and late fees through November 15, 2017, and $36,000 to restore the Premises, totaling $948,504.41, plus 8% interest per annum at $200.03 per day. (Pls.' Mem. 9; Notice of Mot.) This amount was calculated in Balsam's unrebutted expert report. (Balsam Report §§ 4–5.) Defendant does not contest this amount, but instead argues that summary judgment should be denied as to damages because (1) the acceleration clause in the Lease is an unenforceable penalty and (2) Defendant cannot be held liable for accelerated rent during the 5-year renewal term. (Def.'s Mem. 14–18.) The Court will address each argument separately.

### a. Acceleration Clause

Plaintiff Leeber exercised its contractual right to terminate the Lease and accelerate all future rent charges as of November 15, 2017. (Pls.' 56.1 ¶ 79.) The relevant acceleration clause provides that, in the event of default, the Landlord may, at any time thereafter "elect to terminate [the] Lease," after which

> Landlord may recover from Tenant all damages incurred by reason of such breach, including the cost of recovering the Demised Premises plus the total of all Minimum Annual Rent, Additional Rent and all other charges reserved in th[e] Lease payable over the remainder of the stated Lease Term discounted to net present value utilizing a 6% discount rate.

(Lease § 20.02(b).) Defendant argues that this clause amounts to an unenforceable penalty. (Def.'s Mem. 14–16.)[13]

---

[13] "The assertion that a liquidated damages clause is in fact an unenforceable penalty is an affirmative defense." *Bell v. Ramirez*, No. 13-CV-7916, 2014 WL 7178344, at *3 (S.D.N.Y. Dec. 9, 2014) (collecting cases). Because Defendant did not raise this in its Answer, (Pls.' 56.1 Ex. 2 at 3), the Court could find this argument waived, *see Howard v. City of New York*, No. 02-CV-1731, 2006 WL 2597857, at *6 (S.D.N.Y. Sept. 6, 2006) (citing Fed. R. Civ. P. 8(c)).

The "well established" rule in New York is that "[a] contractual provision fixing damages in the event of breach will be sustained if the amount liquidated bears a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation." *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 361 N.E.2d 1015, 1018 (N.Y. 1977); *see also 136 Field Point Circle Holding Co., LLC v. Invar Int'l Holding, Inc.*, 644 F. App'x 10, 12 (2d Cir. 2016) (same). "If, however, the amount fixed is plainly or grossly disproportionate to the probable loss, the provision calls for a penalty and will not be enforced." *Truck Rent-A-Ctr., Inc.*, 361 N.E.2d at 1018. "Whether [the rent acceleration clause here] represents an enforceable liquidation of damages or an unenforceable penalty is a question of law, giving due consideration to the nature of the contract and the circumstances." *JMD Holding Corp. v. Cong. Fin. Corp.*, 828 N.E.2d 604, 609 (N.Y. 2005). "The burden is on the party seeking to avoid liquidated damages—here, [Defendant]—to show that the stated liquidated damages are, in fact, a penalty." *Id.* Thus, to satisfy its burden of proof, Defendant "must demonstrate either that damages flowing from a prospective early termination were readily ascertainable at the time [the Parties] entered into [the Lease], or that the [accelerated rent clause] is conspicuously disproportionate to these foreseeable losses." *Id.*

Defendant makes *no* attempt to satisfy this burden. It does not cite, let alone introduce, evidence relating to the disproportionality of the damages requested by Plaintiffs. Instead, it merely cites caselaw stating the above standards governing liquidated damages clauses. (Def.'s Mem. 14–16.) But, "[i]n the vast majority of instances . . . [rent acceleration] clauses have been enforced at law in accordance with their terms." *Fifty States Mgmt. Corp. v. Pioneer Auto Parks, Inc.*, 389 N.E.2d 113, 116 (N.Y. 1979); *see also In re AMR Corp.*, 730 F.3d 88, 101 (2d Cir. 2013) (citing *Fifty States* for this proposition in the context of an automatic acceleration

provision in a loan agreement). Indeed, "[a]bsent some element of fraud, exploitive overreaching or unconscionable conduct on the part of the landlord to exploit a technical breach, there is no warrant, either in law or equity, for a court to refuse enforcement of the agreement of the parties." *Fifty States Mgmt. Corp.*, 389 N.E.2d at 116. This is because "an acceleration clause, so common in other commercial transactions, is merely a device in the landlord-tenant relationship intended to secure the tenant's obligation to perform a material element of the bargain," and therefore, "its enforcement works no forfeiture." *Id.*

Defendant has not argued that Plaintiffs procured the rent acceleration clause here through any misconduct. In fact, it is beyond dispute that the Lease was negotiated between two commercial parties, represented by counsel. (Freeman Reply Decl. Ex. 31 at 26; *id.* Ex. 32 at 19, 64–65.) New York courts "have cautioned generally against interfering with parties'' agreements," particularly in such circumstances. *JMD Holding Corp.*, 828 N.E.2d at 609; *see also Walter E. Heller & Co. v. Am. Flyers Airline Corp.*, 459 F.2d 896, 899 (2d Cir. 1972) (upholding liquidated damages clause that was "the product of an arms-length transaction between sophisticated businessmen, ably represented by counsel"). Defendant has also not argued that the breach here was "technical," "trivial," "inconsequential," or "collateral to the primary obligation" under the Lease. *Fifty States Mgmt. Corp.*, 389 N.E.2d at 116; *see also 172 Van Duzer Realty Corp. v. Globe Alumni Student Assistance Ass'n, Inc.*, 25 N.E.3d 952, 956 (N.Y. 2014) (noting that the rule in *Fifty States* "addresses . . . the inequities of damages disproportionate to the losses incurred as a result of a tenant's collateral or minor breach"). Nor could it, because Defendant indisputably committed material breaches of the Lease by failing to pay rent and improperly abandoning the Premises. (Pls.' 56.1 ¶¶ 71–74; *see also* Lease §§ 20.01(a), (e).) *See 172 Van Duzen Realty Corp.*, 389 N.E.2d at 956 (explaining that the *Fifty*

*States* rule "is inapplicable to defendants . . . who commit[] material breaches of the lease by ceasing all rental payments . . . and simultaneously abandoning the premises"); *Fifty States Mgmt. Corp.*, 389 N.E.2d at 116–17 (upholding rent acceleration clause because it "is nothing more than a bargained-for device which seeks to insure the performance of a material element of the obligation of the tenant and fixes the damages for its breach"). Therefore, the Court declines to find that a clause requiring Defendant to pay the future rent payments owed under the Lease is, as a matter of law, "plainly or grossly disproportionate to the probable loss" from Defendant's breach. *Truck Rent-A-Ctr., Inc.*, 361 N.E.2d at 1018.[14]

### b. Renewal Term

Defendant also argues that, under the terms of the Lease, Plaintiffs cannot collect accelerated rent for the five-year renewal term. (Def.'s Mem. 16–18.) It is undisputed that the 20-year Lease commenced November 1, 2004, (Pls.' 56.1 ¶ 19), and that Leeber and Defendant agreed to extend the Lease term by an additional five years—that is, until 2029—in 2008, (*id.*

---

[14] Defendant also argues that the acceleration clause is unenforceable because the Lease does not require Cohen, the landlord, to re-rent the premises after re-possessing the Premises after Defendant's default. (Def.'s Mem. 15.) The New York Court of Appeals has expressly rejected this argument, explaining that "once a tenant abandons the property prior to expiration of the lease, a landlord is within its rights under New York law to do nothing and collect the full rent due under the lease." *172 Van Duzen Realty Corp.*, 25 N.E.3d at 956 (internal quotation marks omitted)). The reason for this rule is "that parties in business transactions depend on the certainty of settled rules, in real property more than any other area of the law." *Id.* (internal quotation marks omitted). Therefore, where, as here, "the parties . . . freely agreed to bind [D]efendant[] to pay rent after termination of the landlord-tenant relationship," the Court may enforce that agreement even if Plaintiffs failed to mitigate damages by re-renting the Premises. *Id.*; *see also Holy Properties Ltd., L.P. v. Kenneth Cole Prods., Inc.*, 661 N.E.2d 694, 696 (N.Y. 1995) ("Although an eviction terminates the landlord-tenant relationship, the parties to a lease are not foreclosed from contracting as they please."). To the extent that a lower New York court has held to the contrary, *see Ross Realty v. V & A Iron Fabricators, Inc.*, 787 N.Y.S.2d 602, 603 (App. Term 2004) ("[W]here, as here, the lease does not require the landlord to re-rent the premises upon its recovery of possession after a default in rent and to apply the rent received from the re-renting to the benefit of the tenant, the accelerated-rent clause is deemed to impose a penalty and is not enforceable."), the Court declines to follow this non-binding case.

¶ 16). This extension was agreed to as part of a settlement in a separate litigation between the Parties, and it was read as a stipulation into the record in open court. (Pls.' 56.1 Ex. 7 ¶ 2; Def.'s Mem. Ex. 7 ("Settlement") at 2–3.) Such stipulations of settlement are enforceable absent a showing of "fraud, collusion, mistake or accident." *Hallock v. State of New York*, 474 N.E.2d 1178, 1180 (N.Y. 1984); *see also Doe v. Kogut*, No. 15-CV-7726, 2017 WL 1287144, at *4 (S.D.N.Y. Apr. 6, 2017) (same). That is because "[a] stipulation of settlement is a contract, enforceable according to its terms." *Corona Fuel Corp. v. Naci*, 35 N.Y.S.3d 171, 173 (App. Div. 2016); *Curry v. New York City Police Dep't*, 726 F. Supp. 2d 273, 274 (S.D.N.Y. 2010) ("Settlement agreements resolving litigation are governed by principles of ordinary contract law.").

However, Defendant argues that the stipulated settlement cannot be enforced under the Lease terms governing the optional 5-year renewal term, which provide that any execution of such option is null and void if Defendant defaults prior to the commencement of the option term. (Def.'s Mem. 16–18.) The relevant provisions state:

Section 1.01  Basic Lease Provisions and Definitions
[. . .]
Option Terms:  There shall be two (2) consecutive Option Terms having a term of five (5) years each (individually, an "Option Term", and collectively, the "Option Terms"). *Each Option Term shall commence on the day immediately following the last day of the prior Term* and shall terminate on the last day of the last calendar month in the applicable Option Term.

Section 3.04 Option to Extend the Lease Term
Tenant shall have the right and option to extend the Lease Term by two (2) consecutive sixty (60) month option terms . . . provided and *expressly conditioned upon that at such time as each Option Term is exercised, Tenant is not in default under this Lease*. Tenant shall exercise each of its Option Terms by serving written notice upon Landlord of its election to exercise each such Option Term as provided in Section 1.01 under Exercise of Option Terms. *In the event Tenant . . . is in default under this Lease* at the time of such exercise or *at any time thereafter prior to the commencement of the applicable option Term*, then, in such event, Tenant

> *shall have no right to such Option Term and the exercise of such Option Term shall*
> *be null and void and of no further force or effect.*

(Lease §§ 1.01, 3.04 (emphasis added).)  Plaintiffs do not dispute Defendant's interpretation of

the Lease or argue that it is ambiguous; instead, they argue that Defendant must be bound by the

settlement, which modified the Lease by extending the *initial* term from 20 to 25 years.  (Pls.'

Reply 13; Letter from Michael A. Freeman, Esq. to Court ("Pls.' Supp. Letter") (May 11, 2018)

(Dkt. No. 73).)

　　　　The Court asked the Parties to provide supplemental briefing on this issue.  (Dkt. No. 69.)

In response, Plaintiffs filed a declaration from Richard H. Sarajian, Plaintiffs' attorney in the

state court action, who averred that one of the conditions of the settlement action "was

[Defendant's] agreement to extend the initial Lease term for the Premises for a period of five

years past the original Termination Date in the Lease."  (Pls. Supp. Letter Ex. 1 ("Sarajian

Decl.") ¶ 8.)  Because the Lease already contained a five-year extension option, Sarajian further

averred that he and Defendant's then-attorney

> agreed that the most efficient and expedient way to effectuate the parties' intentions
> to extend the initial term for these agreed upon years was, as stated in open court,
> for [Defendant] to "exercise[] its first option to extend that lease and renew that
> lease for an additional five-year period."

(*Id.* ¶ 9 (quoting Settlement at 4).)

　　　　Regardless of what the Parties deemed efficient at the time, the fact remains that in the

stipulation of settlement, Defendant "exercise[d] its first option," (Settlement 4; *see also* Lease

§ 1.01 (defining "Option Terms")), rather than modify the existing initial 20-year Lease term

commencing November 1, 2004, (Pls.' 56.1 ¶ 19; Lease § 1.01 (defining "Lease Term")).  To the

extent Sarjian avers otherwise, his proffered interpretation is simply not supported by the

unambiguous text of the stipulation that was read into the record in open court, treated as a

written contract, and thus is inadmissible parol evidence. (*Compare* Sarajian Decl. ¶ 8 *with*

Settlement 4.) *See Schron v. Troutman Sanders* LLP, 986 N.E.2d 430, 436 (N.Y. 2013) ("Parol

evidence—evidence outside the four corners of the document—is admissible only if a court finds

an ambiguity in the contract."); *Doe v. Pataki*, 481 F.3d 69, 76 (2d Cir. 2007) (looking to "the

words of the [s]tipulation" and the parties "intent, properly assessed based on objective indicia,"

such as "the nature of the litigation"); *Sayers v. Rochester Tel. Corp. Supplemental Mgmt.*

*Pension Plan*, 7 F.3d 1091, 1096 (2d Cir. 1993) (holding that an "affidavit [wa]s immaterial to

any determination of the parties' intent" because it was "[o]n the whole . . . argumentative and

conclusory"); *Morgan Guar. Tr. Co. of New York v. Bay View Franchise Mortg. Acceptance Co.*,

No. 00-CV-8613, 2002 WL 818082, at *3 (S.D.N.Y. Apr. 30, 2002) ("Given the unambiguous

language of [the contract] . . . extrinsic evidence of intent is not admissible."). Plaintiffs cite no

cases requiring the Court to find a contract modification in such a circumstance, where a post-

litigation affidavit proffers the intent of the contracting parties to be at odds with the text of the

stipulation of settlement read into open court. Simply put, these parties, "sophisticated business

entities, represented by counsel, . . . easily could have included a provision" in the stipulation of

settlement evincing their intent to modify the initial lease term, rather than execute the five-year

option, but they did not, and thus their unambiguous agreement cannot be altered by Sarajian's

declaration. *Schron*, 986 N.E.2d at 436.

Therefore, while Defendant's supplemental submission left much to be desired, it is

correct that Defendant's execution of its first option in the stipulation of settlement is "null and

void and of no further force or effect," because, as explained earlier, Defendant "[wa]s in default

. . . at a[] time . . . prior to the commencement of the applicable Option Term," (Lease § 3.04),

which is set to "commence on the day immediately following the last day of the prior Term," a

date in 2024 which has not yet arrived, (*id.* § 1.01).[15] In other words, the Court concludes that the stipulated settlement did not modify §§ 1.01 and 3.01 of the Lease by changing the initial term from 20 to 25 years, but rather, it incorporated Defendant's execution of it first-five year option, which was later rendered null and void by Defendant's default. (Lease §§ 1.01, 3.01.) Defendant is therefore not liable for the rent that would have accrued during the first five-year option term.

## III. Conclusion

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is granted in part and denied in part and Defendant's counterclaims are dismissed. The Clerk of Court is respectfully directed to terminate the pending Motion. (Dkt. No. 53). Plaintiffs should submit a revised calculation of attorney's fees and damages in accordance with this Opinion and a proposed judgment within 14 days.[16]

SO ORDERED.

DATED:    June **1**, 2018
          White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[15] Defendant's supplemental submission does not discuss the Parties' intentions in formulating the terms of the settlement, nor does it address the legal question posed by the Court's order; instead, it merely repeats almost verbatim its arguments from its original Memorandum of Law. (Letter from Adam K. Kurland, Esq. to Court (May 11, 2018) (Dkt. No. 74).)

[16] Plaintiffs seek attorney's fees and costs pursuant to § 20.08 of the Lease. (Pls.' Mem. 10–12; Pls.' Reply 14–15.) Both of these requests are supported by documentation. (Freeman Decl.) Because Defendant did not contest the requested amount of costs, it may not later do so. (*See* Freeman Decl. Ex. 4.) However, it may renew its arguments already advanced with respect to attorney's fees, (Def.'s Mem. 18–19), and challenge any new fees requested by Plaintiffs.